**FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| LAURA DePINTO, individually abd [sic] as Guardian Ad Litem of M.D., a minor, and MICHAEL LaROCCO and ROBIN LaROCCO, individually and as Guardians Ad Litem of A.L., a minor, | : : : : : | |
| Plaintiffs, | : : | Civil Action No. 06 - 5765 (JAG) |
| v. | : : | **OPINION** |
| BAYONNE BOARD OF EDUCATION, CATHERINE QUINN, JANICE LORE and PATRICIA McGEEHAN, | : : : : | |
| Defendants. | : : | |

**APPEARANCES**:

Robert A. Vort, Esq.
Karin R. White Morgen, Esq.
Robert A. Vort, LLC
2 University Plaza
Hackensack, New Jersey 07601
For Plaintiffs Laura DePinto, individually and as Guardian Ad Litem of M.D., and Michael LaRocco and Robin LaRocco, individually and as Guardians Ad Litem of A.L.

Robert J. Merryman, Esq.
John P. Harrington, Esq.
Apruzzese, McDermott, Mastro & Murphy, P.C.
25 Independence Boulevard
Post Office Box 112
Liberty Corner, New Jersey 07938
For Defendants Bayonne Board of Education, Catherine Quinn, Janice LoRe, and Patricia McGeehan

**GREENAWAY, JR., U.S.D.J.**

This matter comes before the Court on the motion for a preliminary injunction by Plaintiffs Laura DePinto ("DePinto"), individually and as guardian ad litem of M.D., a minor, and Michael and Robin LaRocco (the "LaRoccos"), individually and as guardians ad litem of A.L., a minor (collectively "Plaintiffs"), seeking to enjoin Defendants Bayonne Board of Education ("Bayonne BOE"), Catherine Quinn ("Quinn"), Janice LoRe ("LoRe") and Patricia McGeehan ("McGeehan") from imposing sanctions on M.D. and A.L. for wearing a button to school, featuring a photograph of members of the Hitler Youth.  For the reasons set forth below, the motion for a preliminary injunction is granted.

## INTRODUCTION

This case is about buttons.  Two fifth grade students attending two separate elementary schools in the Bayonne School District (the "District") wore a button to protest the District's mandatory uniform policy (the "Button").  The Button bears the phrase "No School Uniforms" and a slashed red circle.  The writing overlays a historical photograph that appears to portray the Hitler Youth.  The picture depicts dozens of young boys dressed in the same uniforms and all facing the same direction.  There are no visible swastikas or any other definitive indication that the boys are members of the Hitler Youth; however, the parties do not appear to contest that the picture portrays an assemblage of the Hitler Youth.

Following the days on which M.D. and A.L. wore the Button, the District sent identical letters home to each student's parents.  The letters stated that "[t]he background images on this badge are considered objectionable[,] are offensive to many Bayonne citizens[,] and do not constitute free speech according to Mr. Kenneth Hampton, attorney for the Bayonne Board of

2

Education."  (Verified Complaint Exs. B and C.)  The letters threatened suspension in the event

that M.D. and A.L. wore the buttons again.  The parents of M.D. and A.L. filed this suit alleging

violation of the First Amendment right of free speech.

## DISCUSSION

**I.      Governing Legal Standards**

      A.      <u>Standard for Preliminary Injunction</u>

The grant of injunctive relief is an "extraordinary remedy, which should be granted only

in limited circumstances."  <u>Instant Air Freight Co. v. C. F. Air Freight, Inc.</u>, 882 F.2d 797, 800

(3d Cir. 1989) (quoting <u>Frank's GMC Truck Center, Inc. v. General Motors Corp.</u>, 847 F.2d 100,

102 (3d Cir. 1988)).  Generally, in determining whether to grant a preliminary injunction or a

temporary restraining order, courts in this Circuit review four factors:

> (1) whether the movant has a reasonable probability of success on the merits; (2)
> whether the movant will be irreparably harmed by denying the injunction; (3)
> whether there will be greater harm to the nonmoving party if the injunction is
> granted; and (4) whether granting the injunction is in the public interest.

<u>Sypniewski v. Warren Hills Reg'l Bd. of Educ.</u>, 307 F.3d 243, 252 (3d Cir. 2002) (citing

<u>Highmark, Inc. v. UPMC Health Plan, Inc.</u>, 276 F.3d 160, 171 (3d Cir. 2001)); <u>see</u> <u>also</u>

<u>Continental Group, Inc. v. Amoco Chem. Corp.</u>, 614 F.2d 351, 356-57 (3d Cir. 1980) (the four

factors listed above are known as the <u>Continental</u> factors).

The applicant must meet its burden on the first two factors before the Court will consider

the third and fourth factors.  <u>See</u> <u>Reebok Int'l Ltd. v. J. Baker, Inc.</u>, 32 F.3d 1552, 1555-56 (Fed.

Cir. 1994) ("Because, irrespective of relative or public harms, a movant must establish both a

likelihood of success on the merits and irreparable harm . . ., the district court may deny a

preliminary injunction based on the movant's failure to establish either of these two crucial

factors without making additional findings respecting the other factors."). "[C]onsideration of

these factors by the district court requires a 'delicate balancing.'" Delaware River Port Auth. v.

Transamerican Trailer Transp., Inc., 501 F.2d 917, 920 (3d Cir. 1974). "[T]he district court's

grant or denial of a preliminary injunction will be reversed only for an abuse of discretion."

Delaware River, 501 F.2d at 920; see also Frank Russell Co. v. Wellington Management Co.,

LLP, 154 F.3d 97, 101 (3d Cir. 1999) ("A court then balances these four Continental factors to

determine if an injunction should issue.").

II.   **ANALYSIS**

    A.   Reasonable Probability of Success on the Merits

       *1.   Supreme Court Precedent*

Since 1988, the basic framework for analyzing First Amendment right to free speech

issues within the public school context has been set forth in a trio of cases: Tinker v. Des Moines

Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675

(1986); and Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988). Most recently, the

Supreme Court of the United States revisited this issue in Morse v. Frederick, --- U.S. ----, 127 S.

Ct. 2618 (2007).

In Tinker, students protested the Vietnam War by wearing black arm bands. In holding

that the school district violated the students right to free speech by prohibiting the use of the arm

bands, the Court set forth the test for free speech limitation in schools. A student may not be

punished for merely expressing views unless the school has reason to believe that the speech or

expression will "materially and substantially disrupt the work and discipline of the school."

Tinker, 393 U.S. at 513.  Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  Id. at 506.  In Tinker, there was "no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be left alone."  Id. at 508.  Subsequent Third Circuit precedent makes clear that Tinker requires a "specific and significant fear of disruption, not just some remote apprehension of a disturbance."  Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 211 (3d Cir. 2001) (Then Circuit Judge Alito wrote for the Court, holding that a school district's Anti-Harassment Policy was unconstitutionally overbroad under Tinker's substantial disruption test.  The Anti-Harassment Policy prohibited, as summarized by the Saxe Court, any speech which satisfied the elements "(1) verbal or physical conduct (2) that is based on one's actual or perceived personal characteristics and (3) that has the purpose or effect of either (3a) substantially interfering with the student's educational performance or (3b) creating an intimidating[,] hostile, or offensive environment."  The Third Circuit held that "3a" complied with Tinker, but that "3b" "appear[ed] to cover substantially more speech than could be prohibited under Tinker . . . .").

The Supreme Court refined its Tinker analysis a generation later, in Fraser.  In Fraser, the school district disciplined Matthew Fraser, a high school student, for a speech to an assembly of students, teachers, and administrators, in which he persistently referred to an extended sexual metaphor (although no blatantly sexual words were spoken) viewed by the school administrators as lewd.  The School District suspended Fraser for three days, and removed him from a list of candidates for speaker at the school's commencement ceremony.  Fraser, 478 U.S. at 678. Fraser's Father, as guardian ad litem, brought suit against the school district, alleging violation of

Fraser's First Amendment right to free speech and seeking injunctive and monetary relief under

42 U.S.C. § 1983.  Id.  Citing "society's interest in teaching students the boundaries of socially

proper behavior," the Court upheld the school's authority to punish the student.  Id. at 681.

     The Fraser Court reasoned that "it is a highly appropriate function of public school

education to prohibit the use of vulgar and offensive terms in public discourse."  Id. at 683.  The

Court focused on earlier Supreme Court cases, which addressed protecting minors from exposure

to "sexually explicit" or "vulgar and offensive" speech.  See FCC v. Pacifica Foundation, 438

U.S. 726 (1978) (holding that the Federal Communications Commission properly considered

George Carlin's "Filthy Words" monologue as "obscene, indecent or profane" within the

meaning of 18 U.S.C. § 1464, while considering the medium's (radio) availability to minors); see

Ginsberg v. New York, 390 U.S. 629 (1968) (upholding a New York statute which banned the

sale of explicitly oriented materials to minors, despite the First Amendment protection of those

materials for adults).

     The Fraser Court also distinguished its facts from Tinker because "[u]nlike the sanctions

imposed on the students wearing armbands in Tinker, the penalties imposed in this case were

unrelated to any political viewpoint."  Fraser, 478 U.S. at 685.  The Third Circuit has interpreted

Fraser as establishing that "there is no First Amendment protection for 'lewd,' 'vulgar,'

'indecent,' and 'plainly offensive' speech in school."  Saxe, 240 F.3d at 213.[1]

---

     [1] In its most recent opinion on this topic, the Supreme Court noted that it is unclear
whether the Fraser Court distinguished itself from Tinker because of a) "the 'marked distinction
between the political message of the armbands in Tinker and the sexual content of [Fraser's]
speech,'" Morse, 127 S. Ct. 2626 (quoting Fraser, 478 U.S. at 680), or b) because "school boards
have the authority to determine 'what manner of speech in the classroom or in school assembly is
inappropriate.'" Morse, 127 S. Ct. at 2626 (quoting Fraser, 478 U.S. at 683).
     Because the Morse Court did not need to "resolve this debate" within Fraser, the Court

A second exception arises in the context of school-sponsored activities.  In <u>Kuhlmeier</u>, staff members of a high school newspaper sued the school when it refused to publish two articles.  The articles addressed "three East Hazelwood [High School] students' experiences with pregnancy [and] the impact of divorce on students at the school."  <u>Kuhlmeier</u>, 484 U.S. at 263. The school administration imposed its judgment and prevented publication of the articles because a) it was concerned about the secrecy of the identities of the pregnant students; b) the references to sexual activity and birth control were inappropriate for younger students; and c) the parents of a student quoted in the article concerning divorce were not allowed to respond to allegations made in the article.  <u>Id.</u> at 263.

The Supreme Court reasoned that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."  <u>Id.</u> at 273.[2]

The Second Circuit has recently summarized the holdings of the original three Supreme Court decisions:

---

outlined only the basic principles from <u>Fraser</u>.  <u>Id.</u> at 2626.  First, <u>Fraser</u> demonstrates that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings."  <u>Id.</u>  Second, and more importantly for our purposes, <u>Fraser</u> established that the "substantial disruption" analysis in <u>Tinker</u> is not absolute.  <u>Id.</u> at 2627.  In other words, there are exceptions to <u>Tinker</u>.

Because the Supreme Court has acknowledged that <u>Fraser</u> is an exception to <u>Tinker</u>, but has not clarified the debate on what that exception is, and because the Third Circuit has not specifically ruled on <u>Fraser</u>, this Court will interpret independently the <u>Fraser</u> exception later in this opinion.  <u>See</u> Section II, A, 2, b, <u>infra</u>, 6-13.

[2] This Court addresses <u>Kuhlmeier</u> only briefly because neither party suggests that M.D. and A.L. are wearing the Button in connection with a school-sponsored activity.

> We distill the following from Tinker, Fraser, and [Kuhlmeier]: (1) schools have wide discretion to prohibit speech that is less than obscene – to wit, vulgar, lewd, indecent or plainly offensive speech; (2) if the speech at issue is "school-sponsored," educators may censor student speech so long as the censorship is "reasonably related to legitimate pedagogical concerns"; and (3) for all other speech, meaning speech that is neither vulgar, lewd, indecent, or plainly offensive under Fraser, nor school-sponsored under [Kuhlmeier], the rule of Tinker applies.  Schools may not regulate student speech unless it would materially and substantially disrupt classwork and discipline in the school.

Guiles ex rel. Guiles v. Marineau, 461 F.3d 320, 325 (2d Cir. 2006) (citations omitted).  This articulation and interpretation is supported by the Third and Ninth Circuits, as well.  Chandler v. McMinnville Sch. Dist., 978 F.2d 524, 529 (9th Cir. 1992) ("We have discerned three distinct areas of student speech from the Supreme Court's school precedents: (1) vulgar, lewd, obscene, and plainly offensive speech, (2) school-sponsored speech, and (3) speech that falls into neither of these categories.  We conclude . . . that the standard for reviewing the suppression of vulgar, lewd, obscene, and plainly offensive speech is governed by Fraser, school-sponsored speech by Kuhlmeier, and all other speech by Tinker.") (citations omitted); Saxe, 240 F.3d at 214 ("To summarize: [u]nder Fraser, a school may categorically prohibit lewd, vulgar or profane language.  Under Kuhlmeier, a school may regulate school-sponsored speech . . . .  Speech falling outside these categories is subject to Tinker's general rule . . . .").

The Supreme Court's recent holding in Frederick v. Morse, does not change this basic framework, or the applicable analyses for the trio.[3]  Instead, Morse adds a third exception to Tinker, allowing a school to censor speech that is "reasonably viewed as promoting illegal drug

_____

[3] Indeed, Chief Justice Roberts traces Tinker, Fraser, and Kuhlmeier in a similar fashion.  See Morse, 127 S. Ct. at 2626-28.

8

use." Morse, 127 S. Ct. at 2625.

In Morse, a student brought suit against the school district when he was punished for displaying a banner which read "Bong HiTS 4 Jesus" during a time when students had been released from classes to watch the Olympic torch relay as it ran through Petitioner's town. The Supreme Court issued five separate opinions, with Chief Justice Roberts writing the majority opinion.

In its analysis, the Morse Court noted that it had, in earlier Fourth Amendment cases in the public school setting, recognized that "deterring drug use by schoolchildren is an 'important – indeed, perhaps compelling' interest." Morse, 127 S. Ct. at 2628 (quoting Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 661 (1995)). The Court cited this governmental interest and the "special characteristics of the school environment," id. (quoting Tinker, 292 U.S. at 506), in holding that school boards may "restrict student expression that they reasonably regard as promoting illegal drug use." Id. at 2629. The Court rejected expressly a broader rule suggested by the school board in Morse which would have allowed prohibition of the offending banner under Fraser's "plainly offensive" language analysis. Id. ("We think that [this rule] stretches Fraser too far; that case should not be read to encompass any speech that could fit under some definition of 'offensive.'").

### 2. *Appropriate Supreme Court Analysis*

At oral argument, counsel for Plaintiffs argued that this case falls clearly under the Tinker analysis, while counsel for Defendants argued that Fraser governed. This Court agrees with Plaintiffs that this case is governed by Tinker, because the photograph displayed by M.D. and A.L. on the Button is not "vulgar, lewd, obscene [or] plainly offensive," as set forth in Fraser and

9

highlighted in Morse, and cannot be deemed to be school-sponsored speech.

> a.      Kuhlmeier and Morse Do Not Apply

Defendants do not argue that M.D.'s display of the Button is a "school-sponsored" activity under Kuhlmeier.  Nor do Defendants argue that the Button could be "reasonably perceive[d] to bear the imprimatur of the school."  Kuhlmeier, 484 U.S. at 271.  M.D. wears the Button of his own accord and not in conjunction with any school assignment or extracurricular activity.  Kuhlmeier does not apply in this case.  Nor does Morse apply, given the absence of any mention, allusion or reference to illegal drug activity.

> b.      Fraser Analysis

The majority of cases that this Court located which analyze First Amendment rights in the public school context, do so under the Tinker analysis.  However, Defendants cite to several cases which, they believe, analyze student speech under Fraser.  See Boroff v. Van Wert City Bd. of Educ., 220 F.3d 465, 470 (6th Cir. 2000) (holding, under the Fraser analysis, that Marilyn Manson T-shirts "contain symbols and words that promote values that are so patently contrary to the school's educational mission [that] the School has the authority . . . to prohibit those T-shirts"); see Harper ex rel. Harper v. Poway Unified Sch. Dist., 445 F.3d 1166, 1185-86 (9th Cir. 2006) (stating, in dicta, that a public school "may restrict a student from displaying a swastika or a Confederate flag" on a scheduled day of racial tolerance) cert. granted and vacated without opinion, 127 S. Ct. 1484 (Mem.) (2007); see Chandler, 978 F.2d 524 at 529 (holding that buttons worn to protest the school district's hiring of teachers to substitute for striking teachers and using the term "scab" were not "vulgar or offensive" under Fraser, and, therefore, proceeded to analyze under Tinker); see West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1365-67 (10th Cir.

2000) (denying an injunction sought by the parents of a student who was suspended for drawing a confederate flag in school); see Broussard v. Sch. Bd. of the City of Norfolk, 801 F. Supp. 1526, 1537 (E.D. Va. 1992) (holding that the school district did not violate the First Amendment rights of a twelve year-old student by prohibiting her from wearing a t-shirt bearing the message "DRUGS SUCK" because the word "suck" is, in this context, "lewd, vulgar, or offensive").

Defendants argue that these cases stand for the proposition that the photograph of the Hitler Youth is lewd, vulgar, indecent or plainly offensive under Fraser.

As an initial matter, this Court notes that West and Harper were decided under the Tinker framework.  Harper, 445 F.3d at 1177 n.14 ("Because we decide [plaintiff's] free speech claim on the basis of Tinker, we need not consider whether his speech was 'plainly offensive' under Fraser.");[4] West, 206 F.3d at 1366 (holding that the school had demonstrated a concrete threat of substantial disruption "based upon recent past events.")  This Court believes the remaining cases, Boroff, Chandler, and Broussard, are less instructive than Guiles ex rel. Guiles v. Marineau, 461 F.3d 320 (2d Cir. 2006).[5]

---

[4] Additionally, during the pendency of this motion, the Supreme Court granted certiorari and vacated the Ninth Circuit's decision without opinion.  Harper ex rel. Harper v. Poway Unified Sch. Dist., 127 S. Ct. 1484 (Mem.) (2007) ("In this case, vacatur of the prior judgment is also appropriate to 'clear the path for future relitigation of the issues between the parties and [to] eliminat[e] a judgment, review of which was presented through happenstance.") (quoting Anderson v. Green, 513 U.S. 557, 560 (1995)).

[5] This Court acknowledges that the holding of Guiles would be different in the post-Morse world.  The images on the shirt at issue in Guiles depicted, among other things, illegal drug use, and would fall arguably under the Morse exception.  This change, however, does not change the Second Circuit's analysis of how Fraser should be interpreted.  In fact, the Morse Court's decision to not apply Fraser broadly to all "offensive" speech supports the analysis of Fraser in Guiles, as opposed to the Sixth Circuit's interpretation in Boroff.

A brief overview of <u>Boroff</u>, <u>Chandler</u>, and <u>Broussard</u> will aid this Court's analysis.  In

<u>Boroff</u>, a high school student wore a Marilyn Manson T-shirt to school.[6]  Extensive testimony

demonstrated that the school district found the Marilyn Manson T-shirts offensive because "the

band promotes destructive conduct and demoralizing values that are contrary to the educational

mission of the school."  <u>Boroff</u>, 220 F.3d at 469.  The school district provided evidence of

Marilyn Manson's lyrics which involved suicide, murder, and racially derogatory terms.  <u>Id.</u> at

470.  The school district also provided magazine articles which portray Marilyn Manson as

having a pro-drug persona, admitting drug use, and promoting drug use.  <u>Id.</u> at 470.  The Court

held that "where Boroff's T-shirts contain symbols and words that promote values that are so

patently contrary to the school's educational mission, the School has the authority, under the

circumstances of this case, to prohibit those T-shirts."

In <u>Chandler</u>, several students wore buttons that used the term "scab" to describe substitute

teachers who filled in for striking teachers.  The Court analyzed the definition of "scab" as it was

used on the buttons.  The <u>Chandler</u> Court noted that the school district did not prohibit buttons

without the word scab, but held that the school district failed to make a showing, in the context

of a motion to dismiss, that "scab" should "be considered per se vulgar, lewd, obscene, or plainly

---

[6] As described by the Sixth Circuit, Marilyn Manson

is the stage name of 'goth' rock performer Brian Warner, and also the name of the
band in which he is the lead singer. . . .  Marilyn Manson (the individual) is popularly
regarded as worshiper of Satan, which he has denied.  He is also widely regarded as
a user of illegal drugs, which he has not denied.

<u>Boroff</u>, 220 F.3d at 467.
The student's T-shirt "depicted a three-faced Jesus, accompanied by the words 'See No
Truth.  Hear No Truth.  Speak No Truth.'[, and, on the back of the shirt] the word 'BELIEVE'
was spelled out in capital letters, with the letters 'LIE' highlighted."  <u>Id.</u>

offensive within the meaning of <u>Fraser</u>."  <u>Chandler</u>, 978 F.2d at 530.  The <u>Chandler</u> Court

continued, stating that

> "[s]ubsequent proof may show that the word 'scab' can reasonably be
> viewed as insulting, and may show that the slogans were directed at
> the replacement teachers.  Such evidence would bear upon the issue
> of whether the buttons might reasonably have led school officials to
> forecast substantial disruption to school activities.  Mere use of the
> word 'scab,' however, does not establish as a matter of law that the
> buttons could be suppressed absent the showing set forth above."

<u>Id.</u> at 531.  Ultimately, the <u>Chandler</u> Court did not grant the injunctive relief the school district

sought.

In <u>Broussard</u>, the case Defendants argue most closely mirrors the facts at hand, a thirteen-

year-old middle school student was suspended for wearing a T-shirt bearing the message "Drugs

Suck!" in large letters.  <u>Broussard</u>, 801 F. Supp. at 1527.  The <u>Broussard</u> Court noted that the

administrators sought only to suppress the manner in which the message was conveyed, and not

the message itself.  Thus, "the case concerns only the authority of school officials to regulate

language displayed on clothing that they reasonably regard as inappropriate and offensive."  <u>Id.</u> at

1534.

The District Court analyzed the student's speech under <u>Fraser</u>, arguing that <u>Fraser</u>

presented a balancing test: "the freedom to advocate unpopular and controversial views in

schools and classrooms must be balanced against society's countervailing interest in teaching

students the boundaries of socially appropriate behavior."  <u>Id.</u> at 1535 (citing <u>Fraser</u> 478 U.S. at

681).  After extensive testimony regarding the meaning and sexual connotation of the word

"suck," the District Court found the shirt to be lewd, vulgar, or offensive.  <u>Id.</u> at 1537.  The Court

stated that the school's determination was not merely "a prudish failure to distinguish the

13

vigorous from the vulgar," because "the word 'suck' does have sexual connotations."  Id. at 1537

(citations omitted).  The ruling was not appealed to the Fourth Circuit.

  In Guiles, a Vermont middle school student was warned that he could only wear a shirt

bearing a critical caricature of President George W. Bush if he taped over portions of the shirt

which depicted illegal drug use and the use of alcohol.  Guiles, 461 F.3d at 322-23.  The shirt

contained large print, reading "George W. Bush, Chicken-Hawk-In-Chief."  Below these letters,

a large picture of the President's face was superimposed over the body of a chicken.  The image

was surrounded by oil rigs and dollar signs.  In one wing, the chicken body holds a straw near

three lines of cocaine and a razor blade.  The other wing holds a martini glass with an olive in it.

The back of the shirt contains similar images and language.  "The sleeves of the shirt each depict

a military patch, one with a man drinking from a bottle, and the other with a chicken flanked by a

bottle and three lines of cocaine with a razor."  Id. at 322.

  The student wore the shirt approximately once a week for two months with no disruption.

On a field trip, however, defendant Marineau determined that the shirt contravened the dress

code of the school and gave the student the choice of turning the shirt inside out, taping over the

images of drugs and alcohol, or changing shirts.  Id. at 323.  The student wore the shirt the

following day and was disciplined.  The student and his parents brought suit in federal court to

enjoin the defendants from enforcing the dress code with regard to the shirt.  Following a three-

day bench trial, the District Court found the images plainly offensive under Fraser.  Id.

  The Second Circuit overturned the District Court, holding that Fraser did not apply and

that defendants did not make a sufficient showing of disruption under Tinker.  Guiles, 461 F.3d

at 330.  The Second Circuit held that Fraser's reach is not so great as to include images of a

martini glass, a bottle and a glass, a man drinking from a bottle, and lines of cocaine.  Id. at 327.

The Second Circuit reasoned that "[l]ewdness, vulgarity, and indecency normally connote sexual innuendo or profanity."  Id. (citing Merriam-Webster's Third New Int'l Dictionary 1147, 1301, 2566 (1st ed. 1981) (defining (a) "lewd" as "inciting to sensual desire or imagination," (b) "vulgar" as "lewd, obscene or profane in expression," and (c) "indecent" as "being or tending to be obscene")).  The Circuit concluded that the images on the shirt were not "lewd," "vulgar," or "indecent."  Id.  The Circuit further reasoned that the sweeping definition of "offensive," "that which causes displeasure or resentment or is repugnant to accepted decency," is unlikely to be the definition envisioned by the Fraser Court.  Id. at 328.  If, in Fraser, the Supreme Court had so intended, "then the rule of Tinker would have no real effect because it could have been said that the school administrators in Tinker found wearing anti-war armbands offensive and repugnant to their sense of patriotism and decency."  Id. at 328.

Instead, reasoned the Guiles Court, the Supreme Court intended a narrower definition: "speech that is something less than obscene but related to that concept, that is to say, speech containing sexual innuendo or profanity."  Id.  In support of this definition, the Guiles Court cites to the fact that "the cases cited by Fraser all concern vulgarity, obscenity, and profanity."  Id.

The decision in Morse does not undercut this analysis of Fraser, despite the fact that the holding in Morse allows prohibition of some portion of the speech addressed in Guiles: speech promoting use of illegal drugs.  The Morse Court stated specifically that it did not address the question of the specific meaning of the Fraser exception.  Morse, 127 S. Ct. at 2626 ("We need not resolve this debate [as to the mode of analysis in Fraser] to decide this case.").  Arguably, the refusal of the Court to "adopt the broader rule that [school] speech is proscribable because it is

plainly 'offensive'" under <u>Fraser</u>, suggests that the narrow interpretation of <u>Guiles</u> is the correct mode of analysis.  <u>See id.</u> at 2629.  Instead of interpreting the case before it under <u>Fraser</u>, the Supreme Court chose to carve out a new, independent exception for speech that supports illegal drug use.  Thus, the Second Circuit's interpretation of <u>Fraser</u> in <u>Guiles</u> is still instructive and appropriate for this Court's consideration.

It appears that the Third Circuit, although not addressing the issue directly, is in agreement with the <u>Guiles</u> Court's interpretation of the <u>Fraser</u> standard.  <u>See Saxe</u>, 240 F.3d at 213 (noting that "<u>Fraser</u> permits a school to prohibit words that 'offend for the same reasons that obscenity offends.'").  The <u>Guiles</u> Court also expressly declines to adopt the Sixth Circuit's position set forth in <u>Boroff</u>, i.e., that "a school has broad authority under <u>Fraser</u> to prohibit speech that is 'inconsistent with its basic educational mission.'" <u>Guiles</u>, 461 F.3d at 329 (quoting <u>Boroff</u>, 220 F.3d at 470).

The <u>Guiles</u> Court concluded that "the images of a martini glass, alcohol, and lines of cocaine . . . may cause school administrators displeasure and could be construed as insulting or in poor taste[, but,] [w]e cannot say . . . that these images, by themselves, are as plainly offensive as the sexually charged speech considered in <u>Fraser</u> nor are they as offensive as profanity used to make a political point."  <u>Id.</u>

<u>Broussard</u> and <u>Chandler</u> appear to fall squarely within the <u>Guiles</u> interpretation of "lewd," "vulgar," "obscene," and "plainly offensive."  <u>Broussard</u>, 801 F. Supp. at 1537 ("the word 'suck' does have sexual connotations"); <u>Chandler</u>, 978 F.2d at 530 (analyzing the term "scab" and declining to apply <u>Fraser</u>).  <u>Boroff</u> stands alone in support of Defendants' argument here for a broad interpretation of <u>Fraser</u>.  Further, the <u>Boroff</u> Court's analysis must now be called into

16

question based on the Supreme Court's recent rejection of a rule allowing prohibition of "any speech that could fit under some definition of 'offensive.'" Morse, 127 S. Ct. at 2629.

As it appears that the Third Circuit has not decided on Fraser directly, this Court finds the interpretation set forth in Guiles is a purer distillation of the Supreme Court precedent. As stated by the Second Circuit in Guiles,

> the phrase 'plainly offensive' as used in Fraser cannot be so broad as to be triggered whenever a school decides a student's expression conflicts with its 'educational mission' or claims a legitimate pedagogical concern. Were that the rule then Fraser would effectively swallow [Kuhlmeier]'s holding that school officials may censor student speech if (1) the censorship reasonably relates to a legitimate pedagogical concern, and (2) the speech is school sponsored. Indeed if schools were allowed to censor on such a wide-ranging basis, then Tinker would no longer have any effect.

Guiles, 461 F.3d at 330 (citations omitted).

In applying this precedent to the case at hand, this Court's interpretation need not be as narrow as that of the Guiles Court (indeed, this Court's ruling applies only to this particular photograph), but only more narrow than the interpretation set forth by the Sixth Circuit in Boroff.

This Court is not oblivious to why faculty and parents, and likely some students, might find the image here offensive, or might find its use in this context in poor taste. The group depicted in the photograph was sponsored and created by one of history's greatest miscreants – a man who committed some of history's most horrific crimes against humanity. Indeed, any images connected with Adolf Hitler or Nazi Germany would invoke thoughts of unspeakable acts.[7]

---

[7] This Court does not, and need not, address the more difficult case of a student who wears or displays obvious symbols of hate or racial divisiveness. If the student in this case had displayed a swastika, a confederate flag, or a burning cross, then this Court's analysis would

On the other hand, the image here is not profane, nor does it contain sexual innuendo. It is, in fact, a rather innocuous photograph – rows and rows of young men, all facing the same direction and wearing the same outfit (with no identifying marks or patches). The photograph contains no visible swastikas, and the young men are not giving the infamous "sieg heil" salute. As noted by Plaintiffs' counsel at oral argument, the young men might easily be mistaken for a historical photograph of the Boy Scouts. The image may be interpreted as insulting or thought to be in poor taste, but it is not "lewd," "vulgar," "indecent," or "plainly offensive" as set forth in Fraser.[8] Fraser and Kuhlmeier do not apply. Thus, this Court analyzes the speech here under the general rule of Tinker. See Saxe, 240 F.3d at 214.

c.    Tinker Analysis

As stated above, Tinker requires a school district to demonstrate, before prohibiting a student's speech, that the speech will "substantially interfere with the work of the school or impinge upon the rights of other students." Tinker, 393 U.S. at 509. Defendants make no such showing. The certifications of Defendants McGeehan, Quinn, and LoRe only assert that

---

differ greatly. While it is unclear whether this Court would so find under Tinker or Fraser (it is eminently more likely that such a symbol would create a disturbance under Tinker), this Court believes that such a display would likely be "plainly offensive" under Fraser; however, the resolution of that dispute is not before this Court.

   [8] It should be noted that this Court posed a hypothetical during oral argument that the "message" of the Button is that school administrators and supporters of the uniforms were akin to Nazis. (T49:20 to T50:3 (this abbreviation refers to the page and line of the Transcript of the motion hearing held in this case on December 15, 2006).) Such an argument, in this Court's view, might dictate a different analysis. This message might cross the line drawn in Tinker, forbidding speech which "intrudes upon . . . the rights of other students" or "colli[des] with the rights of other students to be secure and to be let alone." Tinker, 393 U.S. at 508. Defendants, however, did not avail themselves of this argument and it is not this Court's business to make those arguments in Defendants' stead.

Defendants, and some faculty and parents, find the Button's image offensive.  (Cert. of Patricia McGeehan ("McGeehan Cert.") 3; Cert. of Catherine Quinn ("Quinn Cert.") 2; Cert. of Janice LoRe ("LoRe Cert.") 2.)  Defendants provided no other evidence.

Further, as a general matter "[t]he passive expression of a viewpoint in the form of a button worn on one's clothing 'is certainly not in the class of those activities which inherently distract students and break down the regimentation of the classroom.'" Chandler, 978 F.2d at 531 (quoting Burnside v. Byars, 363 F.2d 744, 748 (5th Cir. 1966)).  Because the Button did not cause any disruption and Defendants failed to demonstrate a "specific and significant fear of disruption, not just some remote apprehension of disturbance," Saxe, 240 F.3d at 211, Defendants' censorship is unwarranted.

Defendants also argue that they do not harm Plaintiffs by prohibiting the image and not the message of the Button, citing to Broussard.  (Defs.' Br. at 16).  Defendants argue that Broussard stands for the proposition that "when schools seek to regulate the form of the message rather than the message, they may do so." Broussard, 801 F. Supp. at 1535 (citing Fraser, 478 U.S. 675).  Any other holding, Defendants argue, "would likely lead to chaos."  This Court disagrees.

First, the Broussard Court decided to regulate the form of the message under the Fraser standard.  The basis of that holding was the determination that a word within the message was vulgar.  We have already determined that the image involved in this case is not vulgar or lewd under Fraser.

Here, again, this Court finds the Second Circuit's analysis in Guiles instructive.  The school district in Guiles also argued that by only directing that the images be covered, they left

19

the political message of the shirt in <u>Guiles</u> intact.  <u>Guiles</u>, 461 F.3d at 331.  The Second Circuit

dismissed this logic, stating that

> [t]he pictures are an important part of the political message Guiles
> wished to convey, accentuating the anti-drug (and anti-Bush)
> message.  By covering them[,] defendants diluted Guiles's message,
> blunting its force and impact.  Such censorship may be justified under
> <u>Tinker</u> only when the substantial disruption test is satisfied.

<u>Guiles</u>, 461 F.3d at 331.  Defendants attempt to blunt Plaintiffs' message in a similar fashion

here.

Further, this Court addressed this issue in great detail during oral argument.  Upon

repeated requests for Defendants' interpretation of the message of the Button, Defendants circled

back to its interpretation of the image, by itself, seeking to separate the image from the message.[9]

This Court recognizes that in some instances, as in the hypothetical posed by Defendants at oral

argument of the image of an aborted fetus, the school will be able to prohibit speech based on the

image alone.  The standard to do so, however, must be that which was set forth in <u>Fraser</u> – to

hold otherwise ignores <u>Fraser</u> altogether.

Defendants failed to demonstrate any fear of disruption, much less the "specific and

significant fear" of disruption required by the Third Circuit.  <u>Saxe</u>, 240 F.3d at 211.

_____

[9] This Court provided two hypothetical situations to demonstrate that the image and content cannot always be strictly separated.  In both scenarios, the fifth grade student is black and the shirt is worn during Black History Month.  In the first hypothetical scenario, a fifth grade student wears a shirt with an image of members of the Ku Klux Klan on the front.  The image is covered by a large "X" and the letters below read "TOLERANCE – The Lesson of Life."

In the second scenario, the same fifth grade student wears a shirt with a large "X" over an image of the confederate flag.  Below the image, the shirt reads "The New South – Tolerance Begins At Home."  (T12:1-25.)  Defendants insisted that these images could be prohibited by the School District because "you have to separate the image from what the button itself may say." (T14:21-22.)

3.    *Modification of <u>Tinker</u> in the Elementary School Setting*

Defendants argue that recent Third Circuit precedent stands for the proposition that

<u>Tinker</u> may not apply to elementary school students, or, alternatively, that the <u>Tinker</u> test is

relaxed significantly for elementary schools.  Defendants focus on dicta in <u>Walker-Serrano v.

Leonard</u>, 325 F.3d 412 (3d Cir. 2003), <u>S.G. v. Sayreville Bd. of Educ.</u>, 333 F.3d 417 (3d Cir.

2003), and <u>Walz v. Egg Harbor Twp. Bd. of Ed.</u>, 342 F.3d 271 (3d Cir. 2003).  From these

precedents, Defendants argue that "[i]t would be inappropriate, and contrary to pertinent Third

Circuit decisions, for a Court to second guess the discretion of school officials in taking

reasonable steps necessary to create an environment conducive to learning for elementary school

children."  (Defs.' Br. 15.)  This Court disagrees with Defendants' interpretation of the Third

Circuit precedent.

a.    <u>Walker-Serrano</u>

In <u>Walker-Serrano</u>, filed first among the Third Circuit cases, a nine-year-old third grade

student prepared a handmade petition to protest her class's field trip to the circus.  <u>Walker-

Serrano</u>, 325 F.3d at 414.  The petition read, "We 3rd grade kids don't want to go to the circus

because they hurt animals.  We want a better feild [sic] trip."  <u>Id.</u>  She circulated her petition on

the playground on two consecutive days.  On the second day, a teacher requested that she put the

petition away because she thought a student might get hurt by the pencil on the playground.

Upset that her daughter was not allowed to circulate the petition, the student's mother brought

the matter to the attention of the school board, eventually suing the school district for violating

her daughter's free speech rights.  <u>Id.</u> at 414-15.  The District Court granted defendants' motion

for summary judgment, concluding that the students' rights were not violated as a matter of law.

Id. at 415.

The Third Circuit, in reviewing the grant of summary judgment, outlined the

Tinker–Fraser–Kuhlmeier framework.  Id. at 416.  The Circuit then reasoned that "any analysis

of the students' rights to expression on the one hand, and of the schools' need to control behavior

and foster an environment conducive to learning on the other, must necessarily take into account

the age and maturity of the student."  Id. (citing Muller by Muller v. Jefferson Lighthouse Sch.,

98 F.3d 1530, 1538 (7th Cir. 1996) ("Age is a critical factor in student speech cases . . . .");

Baxter by Baxter v. Vigo County Sch. Corp., 26 F.3d 728, 738 (7th Cir. 1994) ("[A]ge is a

critical factor in assessing the extent of a student's free speech rights in school.").[10]

The Circuit acknowledged that Tinker applies, but reasoned that Tinker is flexible enough

to accommodate the age of the children.  Id. at 417.  "Tinker provides a flexible standard" and in

the case of elementary school children "requires that schools have a legitimate educational or

disciplinary justification for regulating school expression."  Id.  "In any event," the Circuit

continued, "if third graders enjoy rights under Tinker, those rights will necessarily be very

limited[, i.e.,] [w]hen officials have a legitimate educational reason."  Id. at 417-18.  Defendants

argue for a different analysis for elementary school children under Tinker based on this language.

---

[10] It is important to note that the Seventh Circuit opinions cited to in Walker-Serrano regarding the necessity of considering the age of the student in school free speech cases do not hold that Tinker and its progeny fail to apply to grade school children.  Muller, 98 F.3d 1539 ("[B]ecause the Supreme Court has not directly decided this question, the following analysis will assume that grade schoolers partake in certain of the speech rights set out in the Tinker line of cases."); Baxter, 26 F.3d at 738 (in holding that a school official had qualified immunity because the First Amendment rights of a grade schooler was not "clearly established," the Seventh Circuit stated that taking into account the age of the student "does not mean that elementary school students are entitled to no First Amendment protection.").  In fact, this Court has found no Circuit decision that alters, in its holding, the test provided by Tinker based on the age or grade level of the children involved.

As stated above, this Court disagrees.

First, the portion of Walker-Serrano cited to by Defendants is not the holding of the case. Following its discussion of the application of Tinker to elementary school students, the Circuit continues "[r]egardless of the extent the Tinker analysis is properly employed in the elementary school context, the record here does not support a First Amendment violation claim." Walker-Serrano, 325 F.3d at 418.  The Circuit noted that the school district did not punish the student for circulating her petition.  Id. at 419.  Because the facts of the case did not show "punishment for expression, a significant pattern of concrete suppression, or some other form of clear suppression of the expression of elementary school students," the Circuit held that there was no violation of the student's First Amendment rights.  Id. at 419.  Although the Walker-Serrano Court went into great depth in analyzing the applicability of Tinker to elementary school children, it decided the case on the grounds that the student was never punished, and, therefore, never suffered a constitutional violation.

Second, the Walker-Serrano majority decision included two concurrences.  The first concurrence focused on the student's activity: soliciting signatures for a petition.  Id. at 420 (Greenberg, C.J., concurring).  Circuit Judge Greenberg makes clear that, as opposed to the expressive speech involved in the case at hand, "[t]his is not a case in which the defendants precluded the student[] from setting forth her views. . . ."  Id.  Relying directly on Tinker, Greenberg states "[w]hen [the student] presented her petition to other children, she was infringing on their rights as they were entitled while at school to be free from her solicitation of their signatures."  Id.  Greenberg, it appears, would have applied Tinker, taking into account the age of the students, and prohibited the solicitation of signatures.  Greenberg does not indicate,

however, that this analysis would expand to expressive speech.

The second concurrence, filed by District Judge Fullam (sitting by designation from the United States District Court for the Middle District of Pennsylvania), directly opposes the idea of a new test for elementary school children.  The second concurrence "find[s] unacceptable" the suggestion "that neither [the student-plaintiff] nor her classmates had sufficient maturity to express or form valid opinions concerning the proposed class trip to the circus."  Fullam would have found that the student had the constitutional right to circulate the petition, but joined the majority because "[t]he record as a whole clearly demonstrates that no Constitutional violation occurred."  Had a constitutional violation occurred, Fullam would have required "a well-founded expectation of disruption."  Id. at 421 (Fullam, D.J., concurring) (quoting Sypniewski, 307 F.3d at 253).

Third, subsequent Third Circuit precedent addressing elementary school children does not expressly alter the Tinker test.[11]  In S.G. v. Sayreville, a case that followed Walker-Serrano by two months, the Third Circuit addressed whether a five-year-old kindergarten student's First Amendment rights were violated when he was punished for saying "I'm going to shoot you," to a

---

[11] Defendants also rely on language from Walz ex rel. Walz v. Egg Harbor Township Bd. of Educ., 342 F.3d 271 (3d Cir. 2003), decided two months after S.G. to support their argument that schools should be given great leeway in what speech may be prohibited for elementary school students.  However, Walz is distinguishable.  The student in Walz was prohibited from distributing gifts containing religious messages in response to a school assignment to bring generic gifts for a school holiday party.  Walz, 342 F.3d at 274.  The Walz Court focused its analysis on the fact that the student's speech came in response to an "organized and structured educational activity," Walz, 342 F.3d at 277, presumably bringing it under the ambit of Kuhlmeier.  "[W]here an elementary school's purpose in restricting student speech within an organized and structured educational activity is reasonably directed towards preserving its educational goals, we will ordinarily defer to the school's judgment."  Walz, 342 F.3d at 278.  The student-plaintiffs in this case did not wear the Button as part of any school-sponsored activity.  Therefore, Kuhlmeier and Walz do not apply.

fellow student while playing a game during recess.  Id. at 418.  The District Court granted

summary judgment for the defendants based on qualified immunity.  Thus, the Circuit analyzed

whether the student had alleged facts sufficient to establish the violation of a constitutional right.

S.G. does go on to address the unanswered question of whether Tinker applies, and to

what extent, in cases involving kindergarten students.  S.G., 333 F.3d at 423 (quoting Walker-

Serrano for the proposition that "[t]he significance of age in this inquiry has called into question

the appropriateness of employing the Tinker framework to assess the constitutionality of

restrictions on the expression of elementary school students").  The S.G. Court goes on to state

"[w]e need not decide in this case whether or if, under what circumstances, a school may violate

an elementary school student's right to freedom of speech," Id. at 423, ultimately basing its

decision on the fact that the speech involved in that case is not expressive and, therefore, outside

of the ambit of Tinker and Saxe.  Id.

The Third Circuit's holding that the speech in S.G. is not expressive distinguishes that

case from the instant case – where Plaintiffs' speech is purely expressive.  Further, S.G. provided

the Third Circuit with an opportunity to state definitively that Tinker does not apply or is

significantly altered when applied to grade school students.  The Third Circuit did not take this

step.[12]

Neither the Walker-Serrano majority decision, nor the S.G. Court, alter the Tinker test in

the elementary school context.  Further, neither concurrence in Walker-Serrano expressly adopts

_____

[12] In all fairness, the Circuit's holding that the speech was not expressive negates the need
to set forth a new rule.  However, the Circuit did discuss Walker-Serrano and the application of
Tinker to elementary school children, in dicta.  That the Third Circuit deigned to discuss Walker-
Serrano, but chose not to definitively alter the Tinker rule for elementary school children,
supports the idea that Tinker appropriately applies here.

the test articulated by the majority for elementary school students, a "legitimate educational reason," to replace the test set forth in <u>Tinker</u>. Further, the Circuit's holding is not based on any modified <u>Tinker</u> test. This Court is unpersuaded that the test articulated in <u>Tinker</u> – that a student may not be punished for merely expressing views, unless the school has reason to believe that the speech or expression will "substantially interfere with the work of the school or impinge upon the rights of other students," – no longer applies to elementary school children in the Third Circuit. Thus, this Court's analysis, under <u>Tinker</u>, stands. <u>Supra</u>, at 13-14.

      B.    <u>Irreparable Harm to the Plaintiffs</u>

Plaintiffs must also show that they will suffer irreparable harm if the injunction is denied. <u>See</u> <u>Sypniewski</u>, 307 F.3d at 252. Here, Plaintiffs seek to exercise their First Amendment right to free speech by wearing the Button. Defendants argue again that they do not seek to censor the message of the Button, but only the image. This Court has already addressed and dismissed this "no harm, no foul" argument. <u>Supra</u>, at 15. Further, the Third Circuit has recognized that "[a] student whose protected expression is stifled suffers an injury that cannot be undone." <u>Id.</u> at 258. This Court agrees. Plaintiffs have established that they will suffer irreparable harm if the injunction is denied.

      C.    <u>Irreparable Harm to the Defendants and the Public Interest and Balancing of Hardships</u>

Once Plaintiffs have demonstrated a likelihood of success on the merits and irreparable harm, a court should consider whether granting the injunction would irreparably harm the responding party and whether an injunction is in the public interest. These issues should be balanced along with the first two requirements: likelihood of success on the merits and irreparable harm to the plaintiffs. <u>Delaware River Port Authority v. Transamerican Trailer</u>

26

Transport, Inc., 501 F.2d 917 (3d Cir. 1974).

The Third Circuit has addressed this balancing succinctly in a similar First Amendment case regarding expressive rights in a public school – Sypniewski, 307 F.3d at 258 (holding that students should be granted a preliminary injunction enjoining the school from punishing students for wearing Jeff Foxworthy T-shirts which bear the term "redneck").  After acknowledging that a student suffers "an injury that cannot be undone" when a school stifles that student's speech, the Third Circuit stated:

> [I]f the school is unable to enforce a policy it needs to provide education and to maintain discipline, the disruption of education or the invasion of other students' rights cannot be reversed.  Both kinds of injuries are substantial.  Thus, neither the irreparability of the injuries nor the balance of the injuries modifies the outcome in any significant way. [T]he public interest demands respect for both constitutional rights and effective education.  For these reasons, the likelihood of success on the merits determines the result of the analysis.

Sypniewski, 307 F.3d at 258.

This Court believes this analysis applies in the instant case, as well.  Plaintiffs seek to exercise their First Amendment rights through expressive speech.  As discussed above, Defendants provide no evidence that the educative process will be disrupted or that the Button will result in a failure in the discipline process.  Further, the public interests here balance exactly as they do in Sypniewski.

27

## <u>CONCLUSION</u>

For the reasons stated above, this Court grants Plaintiffs' motion for a preliminary injunction.  However, it should be noted that this Court's ruling is very narrow.  Under this preliminary injunction, M.D. and A.L. are allowed to wear the Button.  This injunction does not allow Plaintiffs to distribute the Button at school,[13] nor does it curtail the ability of the school to take action if wearing the Button runs afoul of this Court's <u>Tinker</u> analysis.


Dated: September 17, 2007

                            S/Joseph A. Greenaway, Jr.           
                            JOSEPH A. GREENAWAY, JR., U.S.D.J.

---

[13] M.D. was asked by school officials not to distribute the buttons in school.  Counsel for Plaintiffs, at oral argument, indicated that Plaintiffs were not challenging this request.